**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JANE A. RESTANI**

**SANDHYA AQUA EXPORTS PRIVATE LIMITED,**

**Plaintiff,**

**and**

**ACCELERATED FREEZE DRYING CO. LTD, ET AL.,**

**Plaintiff-Intervenors,**

**v.**

**UNITED STATES,**

**Defendant,**

**and**

**AD HOC SHRIMP TRADE ACTION COMMITTEE and the AMERICAN SHRIMP PROCESSORS ASSOCIATION**

**Defendant-Intervenors.**

**Court No: 26-01706**

**RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD OF PLAINTIFF SANDHYA AQUA EXPORTS PRIVATE LIMITED**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff Sandhya Aqua Exports Private Limited ("Sandhya") hereby respectfully moves for judgment on the agency record on the issues presented in its accompanying memorandum challenging the final results of the antidumping duty review on *Certain Frozen Warmwater Shrimp From India* conducted by the U.S. Department of Commerce ("Commerce"). *See Certain Frozen Warmwater Shrimp From India: Final Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 5,717 (Dep't Commerce Feb. 9, 2026) ("Final Results").

For the reasons set forth in the attached Memorandum in Support of Plaintiff Sandhya's Rule 56.2 Motion for Judgment Upon the Agency Record, Commerce's Final Results are not supported by substantial evidence on the record or otherwise is not in accordance with law. Sandhya respectfully moves this Court to so hold, to declare the Final Results unlawful, to remand this case to Commerce for reconsideration and redetermination consistent with Sandhya's accompanying Memorandum of Law, and to grant such other relief as may be just and proper.

Sandhya submits the attached Memorandum in support of this motion.

Respectfully submitted,

/s/ Henry D. Almond

Henry D. Almond
David J. Park
Lynn Fischer Fox
Kang Woo Lee
Archana Rao P. Vasa
Sally Alghazali
Jennifer "Ellie" Farrin

*Counsel to Sandhya Aqua Exports Private Limited*

Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 942-5000
Fax: (202) 942-5999
E-mail: Henry.Almond@arnoldporter.com

**Dated: August 26, 2026**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JANE A. RESTANI**

| | | |
|---|---|---|
| **SANDHYA AQUA EXPORTS PRIVATE LIMITED,** | ) | |
| **Plaintiff,** | ) | |
| **and** | ) | |
| **ACCELERATED FREEZE DRYING CO. LTD, ET AL.,** | ) | |
| **Plaintiff-Intervenors,** | ) | |
| **v.** | ) | **Court No: 26-01706** |
| **UNITED STATES,** | ) | |
| **Defendant,** | ) | |
| **and** | ) | |
| **AD HOC SHRIMP TRADE ACTION COMMITTEE and the AMERICAN SHRIMP PROCESSORS ASSOCIATION** | ) | |
| **Defendant-Intervenors.** | ) | |

**MEMORANDUM IN SUPPORT OF SANDHYA AQUA EXPORTS PRIVATE LIMITED'S MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

**ARNOLD & PORTER KAYE SCHOLER LLP**
**601 Massachusetts Avenue, N.W.**
**Washington, D.C. 20001**
**Phone: (202) 942-5000**
**Fax: (202) 942-5999**

**Henry D. Almond**
**J. David Park**
**Lynn Fischer Fox**
**Kang Woo Lee**
**Archana Rao P. Vasa**
**Sally Alghazali**
**Jennifer "Ellie" Farrin**

***Counsel to Sandhya Aqua Exports Private Limited***

**Dated: August 26, 2026**

TABLE OF CONTENTS


I. STATEMENT PURSUANT TO RULE 56.2 ..... 1

A. Administrative Determination Under Review ..... 1

B. Issues Presented for Review ..... 1

II. STATEMENT OF FACTS ..... 2

III. SUMMARY OF ARGUMENT ..... 6

IV. STANDARD OF REVIEW ..... 8

V. ARGUMENT ..... 9

A. Commerce's Differential Pricing Methodology Is Unsupported by Substantial Evidence and Not in Accordance with Law ..... 9

1. Commerce Did Not Afford Sandhya an Adequate Opportunity To Address Its Newly Adopted Price-Difference Test With Record Evidence ..... 9

2. Commerce Did Not Reasonably Explain Why a Fixed Two-Percent Threshold Identifies "Significant" Price Differences Under 19 U.S.C. § 1677f-1(d)(1)(B)(i) ..... 13

3. Commerce's Price-Difference and Ratio Tests Did Not Establish a Statutory "Pattern" of Significant Price Differences ..... 17

4. Commerce Did Not Adequately Explain Its Decision To Apply A-T Comparisons to Non-Passing Sales ..... 21

B. Commerce Improperly Assigned Surrogate Costs to Products Sandhya Sold but Did Not Produce ..... 23

C. Commerce Incorrectly Declined to Deduct Certain Canadian Expenses from the Third Country Comparison Market Prices ..... 27

VI. CONCLUSION ..... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*AG der Dillinger Hüttenwerke v. United States*,
156 F.4th 1314 (Fed. Cir. 2025) ....................27

*Apex Exports v. United States,*
777 F.3d 1373 (Fed. Cir. 2015)....................28

*Consol. Edison Co. of New York v. N.L.R.B.*
305 U.S. 197 (1938)....................8

*CS Wind Viet. Co. v. United States*
832 F.3d 1367 (Fed. Cir. 2016)....................8

*Garg Tube Export LLP v. United States*,
740 F. Supp. 3d 1355 (Ct. Int'l Trade 2024) ....................13

*Gov't of Can. v. United States*
Court No. 23-00187, 2026 WL 2161176 (Ct. Int'l Trade July 27, 2026)..........12, 16, 20, 23

*JBF RAK LLC v. United States*,
790 F.3d 1358 (Fed. Cir. 2015)....................19

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....................8

*Marmen Inc. v. United States*,
134 F.4th 1334 (Fed. Cir. 2025) ....................13, 17

*Marmen Inc. v. United States,*
Consol. Court No. 20-00169, 2026 WL 1726609 (Ct. Int'l Trade June 15, 2026) ....................12, 16, 23

*Mid Continent Nail Corp. v. United States,*
34 CIT 512, 712 F. Supp. 2d 1370 (2010) ....................9, 10

*Nippon Steel Corp. v. United States,*
458 F.3d 1345 (Fed. Cir. 2006)....................8

*Stupp Corp. v. United States,*
5 F.4th 1341 (Fed. Cir. 2021) ....................20

*Timken Co. v. United States,*
179 F. Supp. 3d 1168 (Ct. Int'l Trade 2016) ....................9, 11, 12

*Toyo Kohan Co. v. United States*,
Court No. 24-00261, 2026 WL 1459170 (Ct. Int'l Trade May 22, 2026)....................12, 16, 21

*Universal Camera Corp. v. N.L.R.B.*,
340 U.S. 474 (1951)..........................................................................................................8

*Universal Tube & Plastic Indus., Ltd. v. United States*,
2026 WL 2428416 (Ct. Int'l Trade Aug. 19, 2026)...............................................16, 19, 20, 23

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
659 F.3d 1142 (Fed. Cir. 2011)..........................................................................................9

**<u>Federal Statutes and Regulations</u>**

19 U.S.C. § 1516a(b)(1)(B)(i)..............................................................................................8

19 U.S.C. § 1673b(b)(3) .....................................................................................................15

19 U.S.C. § 1677b(a)(1)(C) ..................................................................................................7

19 U.S.C. § 1677b(a)(6)(B)(ii) ............................................................................................29

19 U.S.C. § 1677b(e) ..........................................................................................................3

19 U.S.C. § 1677f(i)(3)(A) ....................................................................................................9

19 U.S.C. § 1677f-1(d)(1)(B) ..................................................................9, 11, 13, 17, 21

19 C.F.R. § 351.106(c)........................................................................................................15

19 C.F.R. § 351.403(c)........................................................................................................14

**<u>Administrative Determinations</u>**

*Alternatives to the Use of Cohen's d; Request for Comment*,
90 Fed. Reg. 21,277 (Dep't Comm. May 19, 2025)...............................................................10

*Certain Frozen Warmwater Shrimp From India: Final Results of Antidumping Duty Administrative Review; 2023–2024*,
91 Fed. Reg. 5,717 (Dep't Comm. Feb. 9, 2026) ........................................................ *passim*

*Certain Frozen Warmwater Shrimp From India: Preliminary Results of Antidumping Duty Administrative Review; 2023–2024*,
90 Fed. Reg. 24,569 (Dep't Comm. June 11, 2025) ...............................................................4

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
89 Fed. Reg. 24,780 (Dep't Comm. Apr. 9, 2024) ..................................................................2

*Welded Line Pipe From the Republic of Korea: Final Determination of Sales at Less Than Fair Value*,
80 Fed. Reg. 61,366 (Dep't Comm. Oct. 13, 2015)....................................................17,

**Other Authorities**

Pattern, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/pattern (last visited Aug. 22, 2026)....................................................17

Statement of Administrative Action (SAA) Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol 1 (1994) ....................................................13, 18, 27

# I. STATEMENT PURSUANT TO RULE 56.2

## A. Administrative Determination Under Review

Sandhya Aqua Exports Private Limited ("Plaintiff" or "Sandhya"), an Indian producer and exporter of shrimp, brings this action to contest certain aspects of the final results of the nineteenth administrative review of the antidumping duty ("AD") order on certain frozen warmwater shrimp from India, issued by the International Trade Administration of the United States Department of Commerce ("Commerce"). *See Certain Frozen Warmwater Shrimp From India: Final Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 5,717 (Dep't Comm. Feb. 9, 2026) ("*Final Results*"), P.R. 240, and accompanying Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review of Certain Frozen Warmwater Shrimp from India; 2023-2024, (Jan. 28, 2026) ("Final Decision Memo"), P.R. 233.

## B. Issues Presented for Review

1. Whether Commerce's decision to replace its preliminary Cohen's *d* analysis with a new price difference methodology and apply A-T comparisons to all of Sandhya's U.S. sales was contrary to law and unsupported by substantial record evidence. As discussed in **Section V.A**, Commerce adopted that methodology after the factual record had closed without affording Sandhya a meaningful opportunity to submit case-specific evidence; did not establish a statutory pattern of significant price differences or explain why A-A comparisons could not account for any such differences; and did not explain its application of A-T comparisons to sales that did not pass its price difference test.

2. Whether, as discussed in **Section V.B**, Commerce's decision to disregard Sandhya's reported costs for products sold but not produced during the period of review, and instead use surrogate costs, is unsupported by substantial evidence and otherwise not in

accordance with law where Sandhya reported those costs in accordance with Commerce's reporting instructions and Commerce did not reasonably explain why they could not be used.

3. Whether, as discussed in **Section V.C**, Commerce's refusal to deduct indirect selling expenses and inventory carrying costs incurred in Canada from Sandhya's Canadian comparison-market sales was unsupported by substantial evidence and contrary to law where those expenses were attributable to bringing the merchandise from Sandhya's factory to its Canadian customers and were necessary to achieve a fair price comparison.

### C. Request for Court Order and Relief Sought

Sandhya respectfully requests that the court remand the *Final Results* consistent with the arguments presented herein, as set forth in the accompanying Proposed Order.

## II. STATEMENT OF FACTS

Below Sandhya provides an overview of the key milestones and decision points in the contested administrative proceeding. In addition to these overview facts, in each argument subsection that follows, we further detail the factual basis of Commerce's decisions and the facts underpinning Sandhya's arguments on each contested issue.

On April 9, 2024, Commerce initiated the contested administrative review of the antidumping duty order on Frozen Warmwater Shrimp from India. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 89 Fed. Reg. 24,780 (Dep't Commerce Apr. 9, 2024) ("Initiation Notice"), P.R. 13. Commerce's period of review was February 1, 2023 through January 31, 2024. Commerce selected as mandatory respondents Sandhya and another Indian producer/exporter, Devi Fisheries Limited and its affiliated companies ("Devi"). Memorandum "2023–2024 Antidumping Duty Administrative Review of Certain Frozen Warmwater Shrimp from India: Respondent Selection" (Jun. 21, 2024), P.R. 34.

On June 25, 2024, Commerce issued an antidumping duty questionnaire to Sandhya. Sandhya fully responded to Commerce's antidumping duty questionnaire and subsequent supplemental questionnaires. *See* Sandhya's Section A Response (July 23, 2024), P.R. 48, C.R. 11–15; Sandhya's Section B Response (Aug. 21, 2024) ("Sandhya's Section B Response"), P.R. 66, C.R. 31–32; Sandhya's Section C Response (Aug. 21, 2024), P.R. 67, C.R. 33–36; Sandhya's Section D Response (Aug. 26, 2024) ("Sandhya's Section D Response"), P.R. 71, C.R. 38–39; Sandhya's Supplemental Sections A-B Response (Feb. 27, 2025) ("Sandhya's Supp. Secs. A-B Response"), P.R. 123–25, C.R. 67–94; Sandhya's Supplemental Section C Response (Mar. 24, 2025), P.R. 136–38, C.R. 112–29; and Sandhya's Supplemental Section D Response (Apr. 3, 2025), P.R. 144–45, C.R. 196–201.

As part of this fact-gathering and questionnaire process, on September 16, 2024, a domestic interested party, the American Shrimp Processors Association ("ASPA"), submitted a particular market situation allegation, alleging that Sandhya's cost of producing subject frozen warmwater shrimp was affected by a particular market situation under 19 U.S.C. § 1677b(e) related to the labor market in India. Letter from ASPA, "Sandhya Particular Market Situation Allegation" (Sept. 16, 2024), P.R. 79, C.R. 43. Sandhya responded with factual information submissions and argument to demonstrate that no such particular market situation existed, and even if one did, no adjustment to Sandhya's reported costs was warranted. *See* Sandhya's "Factual Information to Rebut, Clarify, and Correct Petitioner's Particular Market Situation Allegation" (Oct. 29, 2024), P.R. 100–04, C.R. 48–53; *see also* "Sandhya's Factual Information

to Rebut, Clarify, and Correct the Department's Particular Market Situation Factual Information" (May 23, 2025), P.R. 168–70.[1]

On June 11, 2025, Commerce issued its *Preliminary Results*. *See Certain Frozen Warmwater Shrimp From India: Preliminary Results of Antidumping Duty Administrative Review; 2023-2024*, 90 Fed. Reg. 24,569 (Dep't Commerce June 11, 2025) ("*Preliminary Results*"). In its *Preliminary Results*, using its then-standard differential pricing methodology, Commerce calculated antidumping duty margins of 5.32 percent for Sandhya and 2.01 percent for Devi. *Id.* Using the differential pricing methodology, Commerce determined to use the "average-to-transaction" method, while the average-to-average method would have yielded a 0.00 duty margin for Sandhya. Memorandum, "Preliminary Results Margin Calculation for Sandhya Aqua Exports Private Limited" (June 5, 2025), P.R. 178, C.R. 226, at 4. As part of its *Preliminary Results*, Commerce assigned a preliminary margin of 3.96 percent to all other named respondents based on the average of the rates calculated for the mandatory respondents. *See Preliminary Results*, 90 Fed. Reg. at 24,569. In its *Preliminary Results*, Commerce did not address the particular market situation allegation, instead indicating it would address the allegation in a subsequent post-preliminary decision memorandum.

On July 15, 2025, Commerce issued a post-preliminary analysis memorandum and updated margin calculations. *See* Memorandum "Post Preliminary Analysis in the 2023-2024 Administrative Review of the Antidumping Order on Certain Frozen Warmwater Shrimp from India" (Jul. 15, 2025) ("Post-Preliminary Analysis"). In its Post-Preliminary Analysis, Commerce modified two aspects of its calculations. First, without any prior notice or discussion,

[1] In this Rule 56.2 Motion, Sandhya is not pursuing the particular market situation claim raised in Count II of its Complaint. *See* Compl. ¶¶ 20–22, ECF No. 8.

Commerce adopted a wholesale modification to its differential pricing analysis. *Id.* at 3–5. Instead of using its former Cohen's *d* test, Commerce instead adopted a new test in which Commerce analyzed whether there was a two percent or greater difference between an individual transaction's price and the average price in a control group. *Id.* at 4. Commerce also modified its analysis to remove the former "mixed methodology" from among the calculation alternatives, instead automatically reverting to the average-to-transaction method where 33 percent or more of the sales "passed" this new two percent price difference test. *Id.* at 2.

Second, Commerce addressed the particular market situation allegation, determining that a particular market situation existed and applied an upward adjustment to the respondents' reported costs where the margin comparisons were to constructed value. *Id.* at 5–12. As a result of these two changes, Sandhya's antidumping duty margin remained unchanged in the Post-Preliminary Analysis, but these two decisions paired with other decisions in the *Preliminary Results* and *Final Results* adversely affected Sandhya's antidumping duty margin calculations.

Subsequent to the *Preliminary Results* and Post-Preliminary Analysis, interested parties, including Sandhya and Devi, submitted case and rebuttal briefs. Sandhya's case brief raised arguments related to (1) the Commerce's differential pricing test, and (2) various calculation issues, including Commerce's assignment of surrogate costs for products that were sold but not produced, Commerce's treatment of expenses incurred in Sandhya's third country Canadian market, and the treatment of export subsidies Commerce found in a related countervailing duty investigation of Frozen Warmwater Shrimp from India.

On January 28, 2026, Commerce issued its *Final Results*. In the *Final Results* Commerce modified aspects of its analysis from that presented in the *Preliminary Results* and Post-Preliminary Analysis, while certain decision points remained unchanged. In particular,

Commerce continued to apply its recently-modified differential pricing test, Commerce continued to find that a particular market situation existed in India with respect to the labor market (though Commerce did modify aspects of its analysis and calculations), Commerce continued to make no adjustment to the antidumping duty calculations or required cash deposits to account for export subsidies, and Commerce continued to assign surrogate costs to products sold but not produced using Commerce's own SAS computer analysis rather than the costs Sandhya reported. As a result of these various modifications, Commerce recalculated Sandhya's antidumping duty margin, resulting in a 5.08 percent duty rate. *See Certain Frozen Warmwater Shrimp From India: Final Results of Antidumping Duty Administrative Review; 2023-2024*, 91 Fed. Reg. 5,717 (Dep't Commerce Feb. 9, 2026) ("*Final Results*") and accompanying Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review of Certain Frozen Warmwater Shrimp from India; 2023-2024, (Jan. 28, 2026), P.R. 233. Commerce also updated Devi's calculations resulting in a final antidumping duty margin of 2.71 percent, and an average rate of 3.76 percent applicable to all non-examined respondents. *Id.*

## III. SUMMARY OF ARGUMENT

First, Commerce's decision to apply A-T comparisons in calculating Sandhya's dumping margin was contrary to law and unsupported by substantial evidence. After the factual record had closed, Commerce abandoned the Cohen's *d* test used in the *Preliminary Results*, adopted a new price difference test using a fixed two-percent threshold, retained the 33-percent ratio test, discontinued the mixed method, and applied A-T comparisons to all of Sandhya's U.S. sales. Commerce afforded Sandhya an opportunity to merely comment on its calculations, but not a meaningful opportunity to submit factual information concerning whether the newly adopted methodology was appropriate for Sandhya's sales and the shrimp industry.

Commerce also did not establish the statutory conditions necessary to depart from A-A comparisons. Its fixed two-percent threshold does not explain why the price differences it identifies are "significant" in Sandhya's industry or for the merchandise under review, and its ratio test merely aggregates sales that passed that threshold without demonstrating a statutory pattern of significant price differences. The record evidence showed that ordinary fluctuations in shrimp costs substantially exceeded two percent, but Commerce did not meaningfully address that evidence. Finally, Commerce did not explain why A-A comparisons could not account for the alleged price differences or why it was appropriate to apply A-T comparisons to sales that did not pass its own price difference test. Commerce's differential pricing determination should therefore be remanded for reconsideration.

Second, Commerce improperly disregarded Sandhya's reported costs for products that Sandhya sold but did not produce during the period of review and substituted surrogate costs. Sandhya reported those costs in accordance with Commerce's instructions, and Commerce's own calculation program materials recognize the use of reported costs as the default approach for such products. Commerce did not identify a deficiency in Sandhya's reported costs or reasonably explain why they could not be used in this review. Its decision to substitute surrogate costs was therefore unsupported by substantial evidence and should be remanded for reconsideration.

Third, Commerce improperly refused to deduct indirect selling expenses and inventory carrying costs incurred in Canada from the prices of Sandhya's Canadian comparison-market sales. Those expenses were attributable to bringing the merchandise from Sandhya's factory to its Canadian customers and must be deducted to permit a fair "ex-factory" comparison with Sandhya's U.S. sales. Commerce's reliance on its usual treatment of home-market indirect

selling expenses did not address the distinct circumstances of a third-country comparison market or explain why the Canadian expenses should remain in normal value. Commerce's refusal to make the deductions overstated normal value and should be remanded for reconsideration.

## IV. STANDARD OF REVIEW

The Court will hold Commerce's determinations unlawful in an antidumping duty proceeding where they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Importantly, "{t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951). The substantial evidence standard of review essentially asks whether, given the evidence on the record as a whole, the agency's conclusion was reasonable. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).

Questions of statutory interpretation are for the Court to decide independently. The Court must determine the "best reading" of the statute using the traditional tools of statutory construction, and statutory ambiguity does not itself permit deference to Commerce's interpretation. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 372, 400 (2024). Where Congress grants Commerce discretion to implement a statutory directive, the Court must ensure that Commerce exercised that discretion within the bounds Congress established and through reasoned decision-making. *See id.* at 394–95. Commerce must examine the relevant record and articulate an explanation that reasonably ties its methodology and conclusions to the governing statutory standard and record evidence. *See CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1376–77 (Fed. Cir. 2016); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370,

1378 (Fed. Cir. 2013) (explaining Commerce is required "to examine the record and articulate a satisfactory explanation for its action."). Its final determination must also address relevant arguments raised by interested parties. 19 U.S.C. § 1677f(i)(3)(A).

## V. ARGUMENT

### A. Commerce's Differential Pricing Methodology Is Unsupported by Substantial Evidence and Not in Accordance with Law

Under the operative statute, Commerce can depart from using the average-to-average ("A-A") comparison method to calculate Sandhya's dumping margin, and instead apply average-to-transaction ("A-T") comparisons, only if the two conditions Congress imposed for the use of A-T comparisons are met. Commerce must find "a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time," and explain "why such differences cannot be taken into account using" the A-A method. 19 U.S.C. § 1677f-1(d)(1)(B)(i)-(ii). As explained below, Commerce's application of its new differential pricing methodology did not adequately satisfy either requirement.

#### *1. Commerce Did Not Afford Sandhya an Adequate Opportunity To Address Its Newly Adopted Price-Difference Test With Record Evidence*

As an initial matter, Commerce's *Final Results* should be remanded because it introduced an entirely new, record-dependent differential-pricing test after the factual record had closed, but did not allow Sandhya to submit information bearing on whether the new test was appropriate in this review. The Final Decision Memo instead reasoned that Sandhya identified no statute, regulation, or precedent requiring Commerce to permit factual submissions concerning its revised analysis. Final Decision Memo at 7–8, P.R. 233. That response misses the point. When Commerce affords an interested party an opportunity to be heard, that opportunity must occur "at a meaningful time and in a meaningful manner." *Timken Co. v. United States*, 179 F. Supp. 3d 1168, 1176 (Ct. Int'l Trade 2016) (quoting *Mid Continent Nail Corp. v. United States*, 34 CIT

512, 517, 712 F. Supp. 2d 1370, 1375 (2010)). Here, Commerce's process did not permit a meaningful response to the new methodology as applied to Sandhya's sales and the relevant market conditions.

Commerce applied the Cohen's *d* test in the *Preliminary Results*. Prelim. Decision Memo at 6, P.R. 173. In its Post-Preliminary Analysis, issued after the close of the factual record, Commerce abandoned that test, adopted a new price difference test using a fixed two-percent threshold; retained the 33-percent ratio test; and discontinued the mixed method. Post-Preliminary Analysis at 2–5, P.R. 185; Post-Preliminary Calc. Memo at 1–2, P.R. 186, C.R. 240. Commerce thus altered both the test used to identify allegedly significant price differences and the consequence of exceeding the ratio-test threshold after the factual record had closed. The new test did not merely apply an established calculation to Sandhya's reported data. It treated ordinary pricing differences of more than two percent as legally significant and evaluated whether those differences warranted using A-T comparisons for all U.S. sales. Post-Preliminary Analysis at 3–5, P.R. 185.

Sandhya acknowledges that Commerce had earlier issued a general request for public comments on alternatives to the Cohen's *d* test. *Alternatives to the Use of Cohen's d; Request for Comment*, 90 Fed. Reg. 21,277 (Dep't. of Commerce May 19, 2025). But that notice did not propose the two-percent price difference test, the 33-percent ratio-test trigger, or Commerce's discontinuation of the mixed method. Nor did it provide Sandhya an opportunity to submit factual information on the record of this review concerning the appropriateness of those choices for Sandhya's sales and the shrimp market. Comments were due on May 30, 2025, and Commerce first applied its new methodology in the Post-Preliminary Analysis issued approximately six weeks later. Sandhya Case Brief at 7, P.R. 206, C.R. 260; Post-Preliminary

Analysis at 2-5, P.R. 185. That general solicitation therefore did not afford Sandhya a meaningful opportunity to develop and place case-specific evidence on the administrative record.

Commerce did release calculations and invited interested parties to submit "arguments and justifications" regarding the new approach. Post-Preliminary Analysis at 5, P.R. 185. But again, Commerce did not request or authorize the submission of factual information which may be relevant to the validity of the two-percent threshold or its application to Sandhya's sales. *See id.* By that point, Sandhya could not develop record evidence regarding the market-specific and product-specific conditions necessary to assess whether observed price differences were significant within the meaning of 19 U.S.C. § 1677f-1(d)(1)(B)(i). Sandhya timely raised this defect in its case brief, explaining that the new methodology prevented it from presenting pertinent information concerning, among other things, inflation and shrimp-market pricing conditions. Sandhya Case Brief at 9–10, P.R. 206, C.R. 260.

Commerce's assertion that Sandhya received an opportunity to submit comments does not cure this problem. Final Decision Memo at 7–8, P.R. 233. The adequacy of the revised methodology turned on facts: whether a two-percent difference was meaningful for Sandhya's products and market, whether the identified differences reflected a statutory "pattern" rather than ordinary variation, and whether A-A comparisons could account for those differences. Commerce could not reasonably predicate a case-specific determination on a newly adopted test while withholding the opportunity to place relevant evidence on the record. Nor does the fact that Commerce has discretion to develop its differential-pricing methodology eliminate its obligation to employ reasonable procedures in doing so. *See Timken*, 179 F. Supp. 3d at 1176–77.

*Timken* does not support Commerce's contrary conclusion. There, the court held that a seven-day comment period on draft remand results was sufficient because the party had known for more than a month that Commerce would apply the differential pricing analysis and, in fact, submitted substantive comments addressing both the analysis generally and its application to the party's database. *Id*. at 1176-77. Here, in contrast, Commerce first disclosed the operative price-difference test after the factual record had closed and limited the ensuing process to argument and justification. Post-Preliminary Analysis at 2–5, P.R. 185; Sandhya Case Brief at 9–10, P.R. 206, C.R. 260. Thus, Sandhya could challenge Commerce's newly announced calculation methodology, but it could not submit the information needed to show why the test's threshold and assumptions did not reasonably identify significant price differences in this review.

The Court's recent decisions sustaining Commerce's new differential-pricing methodology do not resolve this distinct procedural issue. Those decisions reviewed Commerce's substantive explanation for the test; none decided whether Commerce afforded a respondent an adequate opportunity to develop record evidence after first adopting the price-difference test late in an administrative review with no opportunity to submit factual evidence. *See, e.g., Toyo Kohan Co. v. United States*, Court No. 24-00261, 2026 WL 1459170, at *8–*9 (Ct. Int'l Trade May 22, 2026) (sustaining Commerce's substantive explanation for the price difference test); *Marmen Inc. v. United States*, Consol. Court No. 20-00169, 2026 WL 1726609, at *6–*7 (Ct. Int'l Trade June 15, 2026) (same); *Gov't of Can. v. United States*, Consol. Court No. 23-00187, 2026 WL 2161176, at *4–*7 (Ct. Int'l Trade July 27, 2026) (same). Commerce's refusal to provide that opportunity rendered its application of the new methodology to Sandhya unsupported by substantial evidence and not in accordance with law. Moreover, *Marmen* did not prescribe the uniform two-percent replacement test Commerce adopted after the factual record

had closed. Rather, it permitted Commerce to develop and justify an alternative analysis suited to the data at issue in that case. *Marmen Inc. v. United States*, 134 F.4th 1334, 1348 (Fed. Cir. 2025). The Court should thus remand for Commerce either to permit the submission and consideration of relevant factual information, or to reconsider its differential pricing determination without relying on the newly adopted test.

#### 2. *Commerce Did Not Reasonably Explain Why a Fixed Two-Percent Threshold Identifies "Significant" Price Differences Under 19 U.S.C. § 1677f-1(d)(1)(B)(i)*

Additionally, Commerce did not reasonably explain why a fixed two-percent threshold identifies price differences that are "significant" within the meaning of 19 U.S.C. § 1677f-1(d)(1)(B)(i). The statute does not authorize A-T comparisons whenever U.S. prices differ by any specified percentage. It permits that exceptional comparison method only where Commerce finds a pattern of export prices that "differ significantly" among purchasers, regions, or periods of time. 19 U.S.C. § 1677f-1(d)(1)(B)(i). The accompanying Statement of Administrative Action further directs Commerce to conduct that inquiry "on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another." Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 842–43 (1994) *reprinted in* 1994 U.S.C.C.A.N. 4040, 4177–78 ("SAA"). Commerce's uniform two-percent threshold does not satisfy that obligation, and this failure is particularly acute where the agency did not engage in any fact finding (as discussed in Section V.A.1) to conduct the case-by-case, industry- and product- specific analysis called for by Congress. The Court has likewise recognized that Congress's use of the term "significantly" affords Commerce flexibility to assess the degree of price difference "depending on the particular context." *Garg Tube Export LLP v. United States*, 740 F. Supp. 3d 1355, 1366–67 (Ct. Int'l Trade 2024). That discretion reinforces, rather than displaces, Commerce's obligation to

explain why its fixed threshold identifies significant price differences in Sandhya's U.S. shrimp sales.

By applying the same threshold it uses under its price difference methodology across proceedings, including this review, Commerce presumed that a two-percent difference is significant in every industry and for every product. Commerce never explained why a two-percent difference was significant in Sandhya's U.S. sales of shrimp. That categorical presumption is incompatible with the SAA's direction that significance be assessed on a case-by-case basis.

Commerce justified the threshold on two grounds. First, Commerce invoked its comparison-market arm's-length test, under which it generally finds that sales to an affiliated customer are outside the ordinary course of trade if the affiliate's price falls outside a 98-to-102-percent range of the price to unaffiliated customers. Second, Commerce analogized to the two-percent *de minimis* threshold for estimated weighted-average dumping margins in investigations. Final Decision Memo at 8–9, P.R. 233. Neither rationale establishes that a two-percent difference in U.S. prices is significant for purposes of the statutory prerequisites to apply A-T comparisons.

The arm's-length analogy is misplaced. The arm's-length test determines whether comparison-market sales to an affiliated customer are sufficiently unaffected by the affiliation to be used in calculating normal value. 19 C.F.R. § 351.403(c). Its purpose is thus to identify sales that may be outside the ordinary course of trade because an affiliated relationship influenced the transaction price. It does not determine whether export prices reveal a pattern of significant differences among purchasers, regions, or time periods, much less whether A-A comparisons cannot account for such differences. The fact that Commerce may exclude an affiliated-party

comparison-market sale because of a two-percent difference does not explain why every two-percent variation in a respondent's U.S. prices satisfies a different statutory condition serving a different purpose.

Commerce's investigation *de minimis* rationale is equally unavailing. The two-percent *de minimis* threshold for estimated dumping margins addresses the overall relationship between U.S. price and normal value in an investigation. *See* 19 U.S.C. §§ 1673b(b)(3), 1673d(a)(4). The price difference test, by contrast, compares subsets of U.S. prices to other U.S. prices to determine whether those prices differ significantly among specified purchasers, regions, or periods of time. The two inquiries measure fundamentally different things. Nor does the lower 0.5-percent *de minimis* threshold applicable in an administrative review supply the missing explanation. *See* 19 C.F.R. § 351.106(c); Final Decision Memo at 9, P.R. 223. With respect to Commerce's reliance on the *de minimis* threshold, the agency's logic is particularly weak: The statute requires Commerce to find a *significant* difference in prices. Whether price differences may be *above de minimis* does nothing to answer the question at hand. As Sandhya explained in the underlying review, Commerce needed to explain why its chosen threshold was appropriate for the statutory inquiry at hand, rather than simply select a percentage used in unrelated antidumping contexts. Sandhya Case Brief at 10–11, P.R. 206, C.R. 260.

Commerce nevertheless concluded that the threshold is case-specific because it is expressed as a percentage and compares each respondent's prices by purchaser, region, and time period. Final Decision Memo at 9, P.R. 233. But a relative measurement is not, by itself, an explanation that the degree of difference it identifies is significant in the relevant market. The same two-percent rule applies irrespective of the product, industry, pricing conditions, or degree of normal variation reflected in the respondent's sales. Commerce therefore substituted a

uniform numerical cutoff for the case-specific significance inquiry Congress directed it to perform.

Sandhya's challenge is not merely an abstract objection to a numerical cutoff. Sandhya placed record evidence showing that the raw-material costs for the shrimp products at issue varied by approximately 10 percent to more than 25 percent between the lowest- and highest-cost quarters, depending on count size. Sandhya's Section D Response at 23 & Ex. D-6, P.R. 71, C.R. 38; Sandhya Case Brief at 12–13, P.R. 206, C.R. 260. That evidence did not dictate a replacement percentage, but it supplied a record-specific reason for Commerce to explain why a two-percent difference in Sandhya's U.S. shrimp prices signified a meaningful price difference rather than ordinary variation in this industry. *Cf. Toyo Kohan*, 2026 WL 1459170, at *8–*9.

Sandhya is cognizant that the Court has recently sustained Commerce's adoption of the two-percent threshold. *See Universal Tube & Plastic Indus., Ltd. v. United States*, 2026 WL 2428416, at *8–*9 (Ct. Int'l Trade Aug. 19, 2026); *Marmen*, 2026 WL 1726609, at *6–*7; *Gov't of Can.*, 2026 WL 2161176, at *5–*6; *Toyo Kohan*, 2026 WL 1459170, at *8–*9. *Universal Tube*, *Marmen,* and *Gov't of Canada* specifically accepted Commerce's reliance on the arm's-length test and the investigation d*e minimis* threshold as part of its explanation for the new methodology. *See Universal Tube*, 2026 WL 2428416, at *7–*9 (Ct. Int'l Trade Aug. 19, 2026); *Marmen*, 2026 WL 1726609, at *6; *Gov't of Can.*, 2026 WL 2161176, at *5–*6. However, most of these opinions are not yet final and were not yet released at the time Sandhya initiated this appeal, and thus Sandhya preserves its contrary position in the event of further review.[2]

[2] Of these decisions, *Marmen* has been appealed. *See* Notice of Docketing, *Marmen Inc. v. United States*, No. 2026-2172 (Fed. Cir. Aug. 20, 2026). As of the filing of this brief, no appeal has been taken in *Gov't of Canada* or *Universal Tube*, but the period to appeal either decision has not expired.

Moreover, the arm's-length and investigation *de minimis* tests answer different questions from the one 19 U.S.C. § 1677f-1(d)(1)(B)(i) poses: whether Sandhya's U.S. prices differ significantly among purchasers, regions, or periods of time. The Federal Circuit held in *Marmen* that Commerce may develop a replacement analysis only if the resulting analysis is "justified as sound for gauging differences in the data sets at issue." *Marmen Inc. v. United States*, 134 F.4th at 1348. A threshold borrowed from the arm's-length test and the investigation *de minimis* standard, without an explanation connecting that threshold to the significance of price differences in Sandhya's U.S. sales, does not meet that requirement. Commerce's determination should therefore be remanded for reconsideration of whether its fixed two-percent threshold reasonably implements the statutory term "significantly" in this review in the case-specific manner dictated by the SAA and the statute.

### 3. *Commerce's Price-Difference and Ratio Tests Did Not Establish a Statutory "Pattern" of Significant Price Differences*

Further, Commerce's price difference and ratio tests did not establish the statutory pattern necessary to justify A-T comparisons. Section 1677f-1(d)(1)(B)(i) requires a "pattern" of export prices that differ significantly among purchasers, regions, or periods of time. The ordinary meaning of "pattern" confirms that Commerce must identify more than a collection of price differences exceeding a narrow numerical threshold. A pattern is a discernible, repeated, or systematic occurrence, not an isolated or incidental variation. See *Pattern*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/pattern (last visited Aug. 22, 2026); *Welded Line Pipe From the Republic of Korea: Final Determination of Sales at Less Than Fair Value,* 80 Fed. Reg. 61,366 (Dep't Commerce Oct. 13, 2015) (accompanying Issues and Decision Memorandum at 20) (acknowledging that "pattern" within the meaning of the statute exists only where observed price differences are sufficiently large and systematic that

they cannot reasonably be attributed to random chance.). The SAA also confirms that Commerce must conduct this inquiry on a case-by-case basis because the significance of price differences depends on the industry and product at issue. SAA at 842–43.

Here, Commerce found that 78.38 percent of the value of Sandhya's U.S. sales passed its price difference test and, on that basis, confirmed the existence of a statutory pattern. Final Calc. Memo at 3, P.R. 236, C.R. 271. But the test identifies only whether a given purchaser, region, or time period has a weighted-average price more than two percent above or below the weighted-average price for the relevant comparison group. It does not test whether the alleged differences are systematic rather than ordinary variations in Sandhya's pricing data. It simply measures whether there "are" price differences, not whether there is a "pattern" of significant price differences. Nor does the ratio test supply that missing analysis. It merely aggregates the value of sales that passed the two-percent test and treats a result exceeding 33 percent as confirmation of a pattern. Final Decision Memo at 11–12, P.R. 233.

Sandhya presented record evidence directly bearing on that question. Sandhya explained that frozen shrimp prices fluctuate with global supply and demand and the availability of particular count sizes. Sandhya's Section D Response at 23, P.R. 71, C.R. 38. Its Exhibit D-6 shows that the relevant raw-material costs varied by approximately 10 percent to more than 25 percent between the lowest- and highest-cost quarters, depending on count size. *Id.* at Ex. D-6, P.R. 71, C.R. 38. Sandhya's Section D response further explained that raw shrimp was its only significant direct-material input and a significant portion of its cost of manufacturing. *Id.* at 12, P.R. 71, C.R. 38. The substantial variation in that dominant cost input was therefore relevant evidence of ordinary market conditions when Commerce assessed whether a two-percent price difference was "significant" in the shrimp industry. Sandhya cited the cost-variation evidence in

its administrative case brief to explain why two-percent price differences are ordinary market variation in this industry, rather than evidence of a meaningful and systematic price pattern. Sandhya Case Brief at 12–13, P.R. 206, C.R. 260.

The Final Decision Memo did not engage with that evidence. Commerce stated that it need not determine "why" a respondent's U.S. prices differ and relied on *JBF RAK* to disclaim any duty to assess market variation in the differential pricing context. Final Decision Memo at 10–11, P.R. 233; *JBF RAK LLC v. United States*, 790 F.3d 1358, 1368 (Fed. Cir. 2015). *Universal Tube* does not alter the limited point Sandhya raises here. There, the Court held that Commerce reasonably could compare U.S. prices across quarters in its price difference test even though Commerce used same-quarter cost and price comparisons in calculating the respondent's margin, because production cost fluctuations affect normal value but do not mechanically distort a comparison of U.S. prices to other U.S. prices. *Universal Tub*e, 2026 WL 2428416, at *5–*7. Sandhya does not contend that raw-material-cost variation automatically invalidates Commerce's U.S.-price comparisons. Rather, record evidence demonstrates that Commerce could not reasonably presume that every price difference exceeding two percent was significant in the shrimp industry or in Sandhya's sales, and, again, Sandhya was constrained in what factual arguments it could present given that Commerce did not afford parties an opportunity to submit additional factual information relevant to this issue.

Commerce did not establish a statutory pattern simply because individual price comparisons exceeded its two-percent threshold. The price difference test asks only whether the weighted-average price for a particular purchaser, region, or time period falls outside the two-percent band Commerce established. The separate "pattern" inquiry asks whether the price differences so identified, considered together, reveal a recurring pricing relationship among

purchasers, regions, or periods of time. Commerce's ratio test does not conduct that inquiry. It merely aggregates the value of sales associated with comparisons that passed the two-percent test and treats a result exceeding 33 percent as confirmation of a pattern. By treating that aggregate as sufficient, Commerce did not explain why the identified price differences collectively constitute a "pattern" in Sandhya's sales. Final Decision Memo at 10–11, P.R. 233.

Commerce also erred in asserting that Sandhya had made no factual argument concerning the ratio test. Final Decision Memo at 12, P.R. 233. Sandhya did not challenge the ratio test solely in the abstract. It argued that both Commerce's two-percent price difference threshold and it s33-percent ratio-test threshold cannot establish the statutory pattern Congress required. Sandhya Case Brief at 10–13, P.R. 206, C.R. 260. Sandhya's record evidence most directly showed that ordinary market variation undermines the two-percent test, whose results supply the inputs to the ratio test. *Id*. at 12-13, P.R. 206, C.R. 260. Once those ordinary variations are treated as "significant" price differences, the ratio test necessarily magnifies the same error by aggregating them into a purported statutory pattern.

Sandhya recognizes that the existing precedent is adverse. The Federal Circuit sustained Commerce's prior ratio test as a reasonable means of identifying a "pattern" of significant price differences identified through the Cohen's *d* test. *Stupp Corp. v. United States*, 5 F.4th 1341, 1354–55 (Fed. Cir. 2021). More recently, the Court sustained Commerce's new price difference and ratio tests, including against challenges that the tests do not identify a statutory pattern and that market volatility undermines their application. *See Universal Tube*, 2026 WL 2428416, at *8–*11; *Toyo Kohan*, 2026 WL 1459170, at *8–*9; *Gov't of Can.*, 2026 WL 2161176, at *6–*9. However, Sandhya preserves its contrary position in the event of further review of these issues as these decisions are not yet final.

Those decisions do not render Commerce's assertion that Sandhya offered no factual basis for its challenge correct. Sandhya's record evidence supports its contention that the two-percent price difference test, and the ratio test that depends on it, did not establish a statutory pattern of significant price differences in this review. Commerce's contrary finding should therefore be remanded for reconsideration.

*4. Commerce Did Not Adequately Explain Its Decision To Apply A-T Comparisons to Non-Passing Sales*

Finally, Commerce did not adequately explain why it applied the A-T method to all of Sandhya's U.S. sales, including sales that did not pass the price difference test. Section 1677f-1(d)(1)(B) permits Commerce to use the A-T method only after finding a pattern of export prices that differ significantly and explaining why the A-A method cannot account for "such differences." 19 U.S.C. § 1677f-1(d)(1)(B)(ii). Thus, even if Commerce identifies a qualifying pattern, its explanation for resorting to A-T comparisons must address the price differences on which that finding rests.

Again, Commerce found that 78.38 percent of the value of Sandhya's U.S. sales passed the price difference test. Final Calc. Memo at 3, P.R. 236, C.R. 271. The remaining 21.62 percent did not. Nevertheless, Commerce applied the A-T method to all U.S. sales because the margin calculated using A-T comparisons for all sales, 5.08 percent, crossed the *de minimis* threshold while the margin calculated using A-A comparisons for all sales was zero. *Id*. Commerce's comparison of a margin calculated by applying A-A comparisons to every U.S. sale with a margin calculated by applying A-T comparisons to every U.S. sale does not explain why Commerce applied A-T comparisons to sales that did not pass the price difference test.

Sandhya raised this precise objection during the course of the administrative review. The 21.62 percent of sales that did not pass the price difference test were sales Commerce treated

differently at the first stage of its analysis because they were not associated with purchaser, region, or time-period price differences exceeding its two-percent threshold. Under Commerce's own analysis, the weighted-average prices for the purchaser, region, or time-period groups associated with those sales remained within Commerce's two-percent band and therefore did not demonstrate the price differences Commerce treated as significant. Final Calc. Memo at 3, P.R. 236, C.R. 271. Those sales consequently did not support Commerce's purported finding of potential masked dumping. Sandhya Case Brief at 14, P.R. 206, C.R. 260. Sandhya thus argued that Commerce apply A-A comparisons to those sales and aggregate the resulting margins with the margins calculated for the sales contributing to the asserted pattern. *Id*.

Commerce's Final Decision Memo did not provide a reasoned response. Commerce did not find that the non-passing sales contributed to masked dumping, nor did it explain why the sales that passed the price difference test did not capture the alleged masked dumping such that A-T comparisons also had to be applied to the distinct non-passing sales. Instead, Commerce stated only that the statute does not require use of a mixed method, that its new policy more closely tracks the statutory authorization to use A-T comparisons when the statutory conditions are met, and that discontinuing the mixed method enhances its ability to address masked dumping. Final Decision Memo at 12, P.R. 233. Those general statements do not explain why the statutory conditions, which Commerce found satisfied based on the sales that passed its price difference test, warranted A-T comparisons for sales that did not demonstrate a significant price difference under that same test.

Sandhya does not contend that the statute mandates retention of Commerce's former mixed method as such. The relevant question is whether Commerce explained why the A-A method could not account for the particular price differences that purportedly justified departing

from the default A-A method in this review. A comparison between an A-A margin calculated for all sales and an A-T margin likewise calculated for all sales cannot answer that question because the latter calculation incorporates sales that did not pass Commerce's own price difference test. It consequently does not isolate whether the asserted inability of A-A comparisons to account for the alleged pattern is attributable to the purportedly differentially priced sales or to Commerce's decision to apply A-T comparisons beyond them. The fact that applying A-T comparisons to every sale produced a higher aggregate margin does not fill that gap. It shows the consequence of applying a different comparison method to the full universe of sales, not why the non-passing sales themselves warranted that treatment or why A-A comparisons could not account for the identified pattern without including them.

Sandhya acknowledges that the Court recently sustained Commerce's decision to discontinue the mixed method. *See Universal Tube*, 2026 WL 2428416, at *9–*11; *Marmen*, 2026 WL 1726609, at *8–*9; *Gov't of Can.*, 2026 WL 2161176, at *7–*9. Those decisions reasoned that neither the statute nor the SAA expressly requires simultaneous application of A-A and A-T comparisons. *Id*. However, Sandhya continues to preserve its contrary position should these decisions become subject to further review.

Commerce's decision to use A-T comparisons for sales that did not pass its price difference test should therefore be remanded. Commerce must either explain, based on the record and the statutory requirement to address "such differences," why A-A comparisons cannot account for those sales or reconsider its decision to apply A-T comparisons to them.

### B. Commerce Improperly Assigned Surrogate Costs to Products Sandhya Sold but Did Not Produce

In reporting its cost of production information, Sandhya reported that it had some products for which it had sales, but no production during the period. Sandhya's Section D

Response at 2, P.R. 71, C.R. 38. Sandhya explained that the costs for these products were determined using the same manner and methodology as the products that were produced during the period. *Id.*

These cost calculations for products that were sold but not produced are not the result of a hypothetical or theoretical exercise. Rather, Sandhya used a process-based cost methodology whereby it first identifies a raw material cost based on the size of the shrimp via a review and allocation of its purchase records and costs to identify the cost of the input shrimp. *See e.g.*, *id.* at 45–46, P.R. 71, C.R. 38. Sandhya also calculates production process costs based on the costs associated with the relevant production stage. These variable production costs are described at pages 52–54 of Sandhya's Section D response. For example, Sandhya calculated power costs based on the type of freezer used to freeze the shrimp (plate freezer or individually quick frozen freezer), and whether the product was cooked. *Id.* at Exhibit D-19, P.R. 71, C.R. 38. The company performed similar calculations for packaging, and preservative/consumable costs. In a simplified example, to calculate the overall costs, Sandhya identified the cost of the raw material (input shrimp) based on the above purchase allocation exercise, and then applied the relevant process costs based on the processed form of the frozen shrimp, essentially pulling from a "menu" of stepwise costs to match the production used to produce the product at issue. These overall calculations can be seen in the cost build-up exhibits at Exhibits D-33 and D-34. *Id.,* P.R. 71, C.R. 38.

With respect to products that were sold but not produced, this exercise was the same. That is, based on the CONNUM of the particular product, Sandhya could map its costs to select the appropriate raw material and process costs that were attributable to the CONNUM at issue. In other words, based on the CONNUM, Sandhya would identify the input shrimp size (and

therefore cost), and based on the finished form, Sandhya could map through and select from the actual process costs which applied and from there calculate an accurate overall cost specific to the CONNUM, even though that specific CONNUM was not actually produced during the period.

Commerce's own calculation instructions confirm that surrogate-cost assignment is a fallback, not an automatic consequence of zero POR production. The preliminary comparison-market program directs Commerce to assign a surrogate cost only for products "sold but not produced during the period and that do not already have adequate surrogate cost information reported." Prelim. Comparison Market Program at 1-E-iii-a, C.R. 231. Thus, before discarding Sandhya's reported, CONNUM-specific cost calculation, Commerce's own guidance suggests it was to determine whether the reported data and calculations were adequate before resorting to surrogates. The instruction does not permit Commerce categorically to reject reported cost information merely because the finished CONNUM was not produced during the POR.

Despite this methodology, in both its preliminary and final calculations, Commerce disregarded Sandhya's reported, CONNUM-specific cost calculations for products sold but not produced, and instead used "surrogate" costs based on the most similar product which was actually produced during the period. Final Decision Memo at 31–32, P.R. 233. Commerce's determination in this respect is unsupported by substantial record evidence, as Commerce did not adequately consider the unique aspects of Sandhya's process-based costing, which rendered the reported costs more accurate than any surrogate cost associated with a similar product (a cost which would be based on the same process based methodology, but not accounting for the specific processes associated with the CONNUM at issue).

In particular, in declining to use Sandhya's reported costs for these products, the Department stated that:

> We disagree with the respondents that their reported surrogate costs are reliable because they rely on the same methodology use to determine the POR costs. Because the respondents had no POR production of the products at issue, the reported surrogate costs are estimates and, as such, they do not represent allocated POR costs.

Final Decision Memo at 32, P.R. 233.

Commerce's explanation does not address that issue. Both Sandhya's reported calculation and Commerce's closest-CONNUM calculation are surrogate costs in the sense that neither rests on POR production of the exact CONNUM. Describing Sandhya's reported costs as "estimates" because the finished CONNUM lacked POR production says nothing about whether the underlying raw-material and process costs were inaccurate or inadequate, and does not explain why Commerce's alternative was more reliable. Moreover, Sandhya's costs are not "estimates." Rather, the reported costs are the actual POR costs associated with the input shrimp, and the actual costs associated with the processes necessary to produce the exact finished product at issue.

Commerce instead substituted the cost of a different CONNUM, which necessarily differed in at least one control-number characteristic. Commerce did not explain why that less CONNUM-specific surrogate better reflected the cost of the product sold. Indeed, while Commerce faulted Sandhya's reported costs as "estimates," Commerce's own selected surrogates are necessarily "estimates" for non-produced CONNUMs, while Commerce's own computer program indicates a preference for adequate surrogate costs reported by the respondent.

Commerce did not identify any error in Sandhya's allocation of actual input-shrimp purchase costs, yields, freezer-specific power costs, cooking costs, packaging costs, or other

process costs to the sold CONNUMs. Sandhya's Section D Response at 34–54 & Exs. D-19, D-33–D-34, P.R. 71, C.R. 38. Nor did Commerce compare those CONNUM-specific cost components with the components of the "most similar" product it selected as a surrogate. Those distinguishing characteristics may carry distinct raw-material, processing, freezing, packaging, or other costs. Commerce did not examine whether its selected closest CONNUM surrogate captured those differences, much less explain why it was more accurate than Sandhya's reported cost build-up.

Even assuming that the absence of POR production for an exact CONNUM created an information gap, Commerce had to explain why its selected surrogate cost, rather than Sandhya's reported CONNUM-specific cost build-up, was a reasonable and more probative measure of the costs at issue. *Cf. AG der Dillinger Hüttenwerke v. United States*, 156 F.4th 1314, 1324–25 (Fed. Cir. 2025) (indicating that when selecting between competing cost data sources and calculations, Commerce's choice must be reasonable). The SAA further indicates that Commerce's selected data source must be the "most probative of the issue under consideration." SAA at 869. Commerce made no such showing that its selected data source was the most reasonable and most probative. Its decision to disregard Sandhya's reported and reasonable cost calculations and substitute costs from a different CONNUM is therefore unreasonable and unsupported by substantial evidence and must be remanded.

### C. Commerce Incorrectly Declined to Deduct Certain Canadian Expenses from the Third Country Comparison Market Prices

Because Sandhya did not have a viable home market, consistent with Department practice and 19 U.S.C. § 1677b(a)(1)(C), Sandhya reported comparison market sales to Canada for purposes of the Department's price-to-price normal value calculations. *See e.g.*, Sandhya's Section B Response at 2, P.R. 66, C.R. 31. Following standard reporting methodologies for third

country sales, among the various expenses and data points, Sandhya reported its indirect selling expenses and inventory carrying costs incurred in India in the data fields INDIRST and INVCART, respectively. *Id.* at 50–53. In addition to these indirect expenses incurred in India, the company's Canadian affiliated sales company incurred similar expenses in Canada, associated with the indirect selling expenses and inventory carrying costs incurred in Canada and associated with sales in the Canadian market. *Id.* Sandhya reported these expenses in the fields INDIRS2T. *Id.*; *see also* Sandhya's Supp. Secs. A-B Response at 32 & Ex. SAB-60, P.R. 123, 125, C.R. 69, 91.

In its antidumping duty calculations, Commerce did not deduct indirect selling and inventory carrying costs incurred in India from either the reported U.S. or Canadian market prices. (This treatment is consistent with the statute and results in an apples-to-apples comparison, as the Indian expenses are retained in the prices on both sides of the equation). With respect to indirect selling expenses and inventory carrying costs incurred by the respective affiliated selling companies in the United States and Canada, Commerce deducted these U.S. expenses from the reported U.S. prices, but did not deduct the parallel Canadian expenses from the reported Canadian prices. *See* Final Decision Memo at 33. That asymmetric treatment of virtually identical sales channels and categories of expenses frustrates the overall goal of Commerce's price adjustments, which is to "arrange an apples-to-apples comparison between the domestic and foreign price of merchandise." *Apex Exports v. United States*, 777 F.3d 1373, 1375 (Fed. Cir. 2015) (explaining that "the overall goal is to arrange an apples-to-apples comparison between the domestic and foreign price of merchandise.").

Commerce's differing treatment of the U.S. and Canadian expenses cannot be explained by any difference in the starting point for the two price comparisons. Except for a small number

of direct Canadian sales, the reported Canadian prices were Sandhya's affiliate resale prices to unaffiliated customers, while all reported U.S. prices were CEP resale prices through Sandhya's U.S. affiliate. Sandhya's Section B Response at 2–3, P.R. 66, C.R. 31. Commerce therefore began with affiliated-reseller prices to unaffiliated customers in both markets, but deducted the affiliated reseller's indirect selling and inventory carrying costs only from the U.S. price. The result brought the U.S. price closer to the ex-factory price while leaving the Canadian price at the downstream reseller level.

In its case brief to Commerce in advance of the *Final Results*, Sandhya argued that Commerce should deduct Canadian market indirect selling expenses, citing to 19 U.S.C. § 1677b(a)(6)(B)(ii) (which directs Commerce to deduct from the comparison gross price all amounts included in the price that are "attributable to any additional costs, charges, and expenses incident to bringing the foreign like product from the original place of shipment to the place of delivery to the purchaser") and the Statement of Administrative Action, which calls for the calculations on both sides of the comparison to be at an "ex-factory level." *See* Sandhya Case Brief at 36, P.R. 206, C.R. 260; SAA at 810.

In its Final Decision Memo, Commerce dismissed this argument, stating (in our view, incorrectly) that "Sandhya does not cite any statutory or regulatory basis, nor any case precedent" to indicate that such a deduction is required. Final Decision Memo at 33, P.R. 233. While Sandhya concedes that there is nothing in the normal value statute that expressly addresses third country indirect expenses in particular, Sandhya did cite 19 U.S.C. § 1677b(a)(6)(B)(ii), which mandates the deduction of any costs associated with bringing the merchandise from the place of shipment to the place of delivery to the customer. This "catch-all" provision of the statute requires the agency to account for all costs incurred after the time of shipment and is

consistent with the SAA's mandate that Commerce compare U.S. prices to comparison prices at an "ex-factory level." Commerce did not address this argument at all, nor did Commerce explain why, in its view, expenses incurred with respect to selling efforts in Canada and the cost of holding merchandise in Canada did not fall within this provision, nor did it (or could it) claim that its calculations yielded "ex-factory" net prices.

In order for this Court to sustain Commerce's determination on this point, at a minimum, the Court would need to understand why Commerce does not view these expenses as within this statutory provision. In full, the provision provides that the following are to be deducted from the comparison market price:

> the amount, if any, included in the price described in paragraph (1)(B), attributable to any additional costs, charges, and expenses incident to bringing the foreign like product from the original place of shipment to the place of delivery to the purchaser,

19 U.S.C. § 1677b(a)(6)(B)(ii).

While Commerce may have some theory as to why these costs are not "included in the price" or associated with activities "incident to bringing" the merchandise from the factory to the Canadian customer, it did not articulate any theory, nor do we believe there is any such reason or basis to consider these expenses as outside the purview of this statutory provision. Rather than address this argument, Commerce simply pointed to its practice regarding indirect expenses incurred in the home market. Final Decision Memo at 33, P.R. 233. While this reasoning does not address the statutory argument Sandhya raised, importantly, this logic steps right over the overarching requirement that Commerce calculate apples-to-apples, ex-factory price comparisons. The focus on such expenses incurred in the home market is also misplaced because those expenses are not deducted from either side of the equation, meaning the comparisons remain apples-to-apples, and their retention in the U.S. and comparison market

price is consistent with the SAA's instruction to calculate ex-factory net prices. However, by retaining these expenses in the Canadian market price, but deducting the parallel expenses incurred in the United States, Commerce has not achieved equitable price comparisons.

Finally, Commerce's reference to deducting the expenses when performing the cost test is irrelevant. Final Decision Memo at 33, P.R. 233 ("Instead of deducting comparison market indirect selling expenses from NV, Commerce accounts for these expenses as part of the cost test."). The cost test measures whether the prices are below the cost of production; necessarily all costs after the time of production need to be deducted, and, this is not an "either/or" scenario where each expense item is relevant for one test or another, but not both. The price-to-price comparisons and cost-to-price comparisons stand on their own, and indirect expenses incurred in the third country market need to be deducted in both instances to arrive at reasonable and fair comparisons.

## VI. CONCLUSION

For the foregoing reasons, Sandhya respectfully requests that this Court hold the foregoing aspects of the *Final Results* to be unsupported by substantial evidence and otherwise not in accordance with law. Sandhya further requests that this Court remand the agency's determination with instructions to Commerce to correct its errors and to provide such other relief as this Court deems just and appropriate.

Respectfully submitted,

/s/ Henry D. Almond

Henry D. Almond
David J. Park
Lynn Fischer Fox
Kang Woo Lee
Archana Rao P. Vasa
Sally Alghazali
Jennifer "Ellie" Farrin

*Counsel to Sandhya Aqua Exports Private Limited*

Arnold & Porter Kaye Scholer LLP
601 Massachusetts Avenue, N.W.
Washington, D.C. 20001
Phone: (202) 942-5000
Fax: (202) 942-5999
E-mail: Henry.Almond@arnoldporter.com

**Dated: August 26, 2026**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JANE A. RESTANI**

| | | |
|---|---|---|
| **SANDHYA AQUA EXPORTS PRIVATE LIMITED,**<br><br>**Plaintiff,**<br><br>**and**<br><br>**ACCELERATED FREEZE DRYING CO. LTD, ET AL.,**<br><br>**Plaintiff-Intervenors,**<br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>**and**<br><br>**AD HOC SHRIMP TRADE ACTION COMMITTEE and the AMERICAN SHRIMP PROCESSORS ASSOCIATION**<br><br>**Defendant-Intervenors.** | ) | **Court No: 26-01706** |

**CERTIFICATION OF COMPLIANCE WITH CHAMBERS PROCEDURE 2(B)(1)**

The undersigned hereby certifies that the attached Memorandum in Support of Plaintiff Sandhya Aqua Exports Private Limited's Rule 56.2 Motion for Judgment Upon the Agency Record, filed on August 26, 2026, contains 9,157 words, exclusive of the table of contents, table of authorities, and counsel's signature block, according to the word count function of the word-processing system used to prepare this brief, and inclusive of the words in the embedded images, counted manually. The brief therefore complies with the maximum 14,000 word count limitation set forth in the Court's Chambers Procedures.

By: /s/ Henry D. Almond
HENRY D. ALMOND

**Dated: August 26, 2026**